NATIONAL LIFE & ACCIDENT INS. CO. *v.* HUGGER.

(Division B.   December 1, 1930.)

[131 So. 75.   No. 29017.]

Thos. J. Tyne, Jr., of Nashville, Tenn., and W. L. Pack, Jr., of Laurel, for appellant.

Goode Montgomery and J. R. Buchanan, both of Laurel, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

This cause originated in a justice of the peace court where judgment was rendered in favor of the plaintiff, Mary Hugger, against the National Life & Accident In-

surance Company of Nashville, Tennessee, a corporation, upon an insurance policy upon the life of Saul Hugger.

The insurance policy carried a death benefit, an accident benefit, and a sick benefit. The clause in the insurance policy defended upon and relied upon to defeat the suit is as follows: "Should the insured die when the premium payments on this policy are four (4) weeks or more in arrears, this company shall not be liable for any sum under this policy except as otherwise expressly provided herein. No liability is assumed by the company prior to the date hereof, nor unless on said date and delivery of this policy the first payment has been legally made and the applicant is then in sound health." The policy was dated on September 2, 1929, and the insured died on September 15, 1929. The proof of death showed that deceased, Saul Hugger, died of cardiorenal disease, hypostatis congestions contributing thereto, which is a disease of the kidneys with heart complications, which the medical testimony showed was Bright's disease with heart complications and was an incurable disease and which medical testimony, not disputed, shows could not have developed within the period between September 2d and September 15th.

The plaintiff, Mary Hugger, testified that Saul Hugger died on the 13th of September, 1929; that the policy involved, which was exhibited to witness' testimony, was a policy on the life of her husband, Saul Hugger. She was then asked;

"When did Saul, after that time (referring to the date of the receipt, August 17th, which the policy was applied for) first get sick—do you remember? A. No, sir. I don't remember.

"Q. You answered the question here in the death proof that when he first quit work in August, you say, August 30, 1929, is that right? A. I don't remember. I reckon so.

"Q. Well, didn't Dr. Moore fill out the blank (referring to death certificate)? A. Yes, sir, at the hospital.

"Q. You were there when it was filled out? A. Yes, sir. I was there.

"Q. I ask you did you have it filled out like you told him? A. He filled it out. . . .

"Q. Another question. Here is, 'On what date did deceased first consult any physician for last illness?' You say 'August 31, 1929.' That's right too, isn't it? A. I reckon so.

"Q. Says here August 31st was the last day he worked. Is that right? A. Is that on the paper?

"Q. August 31st. Is that right? A. I reckon so.

"Q. This is the proof that you filed with the insurance company? A. Insurance company?

"Q. Yes, death proof you filed with the insurance company? A. Yes, sir.

"Q. Now, Mary, one other question. The date of death here gives September 15, 1929—is that right? A. September 15th?

"Q. September 15, 1929. A. You mean the date he died?

"Q. The date he died. Is that right? A. I don't know how come they put that in there, it was the 13th.

"Q. It was the 13th? A. I took it to be. . . .

"Q. Mary, when did Saul go to the hospital? A. Saturday. The third Saturday in September.

"Q. Well, now, here in reference to his death—how many days was that before Saul died? A. He came there on Saturday and died about 11 o'clock Sunday morning.

"Q. It was just about a day before he died. A. Yes, sir.

"Q. Well, now, on this blank they have this question. 'On what date did deceased first consult any physician for last illness?' They have the date, August 31, 1929.

Was Saul in the hospital at that time? A. 31st of August, he was.

"Q. What doctor saw him at that time? A. 31st of August?

"Q. Yes. A. I don't remember—31st of August.

"Q. What doctor came to see Saul before he went to the hospital? A. Dr. Gatlin. . . .

"Q. You say here that Saul quit work August 30th. What if anything was the matter with Saul at that time? A. The 30th? He just at the time quit work. The doctor told him to rest up about two weeks.

"Q. How many times did Dr. Gatlin come? A. Just twice.

"Q. Just twice? A. Yes, sir.

"Q. What other time beside August 31st? A. I don't remember what date. It was that same Saturday he went to the hospital.

"Q. Same date he went to the hospital. That was about three weeks then between the visits? A. Yes, sir.

"Q. Well, now, back to the time that Saul laid off from work and the time he went to the hospital. What did Saul do during that time? A. Not anything. You mean before he—the time he was off?

"Q. The time he was off. What did he do during that time so far as you know. Was he in bed? A. No, sir. He wasn't in bed. He went home.

"Q. He went home. What do you mean by going home? He went somewhere to rest? A. Yes, sir.

"Q. On a visit? A. Yes, sir.

"Q. Well, tell the court something of Saul's condition —as to how he appeared to get about during that time, etc. A. Never gave up—still stayed up—never was in bed not until about that Friday before his death. He never did say give up. He stayed up all the time until the Friday before he died—stayed in bed then."

The defendant introduced a physician who testified, as above stated, that it was impossible for the disease to have been developed to the extent to prove fatal within the time between the delivery of the policy and Saul Hugger's death; and that, necessarily, Saul Hugger was not in sound health when the policy was delivered. The receipt for the first premium, delivered on the 17th of August, contained the same stipulation that the policy did as to no liability being assumed until the date the policy is delivered, nor at that time unless the insured was in sound health. It also contained a provision that any physician who treated the insured should be available as a witness. In other words, the statute making the testimony of a physician privileged was waived. Neither the plaintiff nor the defendant introduced the physician who attended the deceased and treated him on the occasion testified about by the plaintiff. It therefore appears that the deceased was not in sound health at the time the policy was delivered to him, and it is highly probable that he had not been in sound health for some time prior to the application for the policy.

The question presented now for decision does not turn upon the delivery of the policy, nor whether there was a nondelivery in law, due to the concealment of the deceased's condition at the time of the delivery. The stipulation in this policy is that no liability is assumed prior to the date of the policy, nor then unless the insured be in sound health on the date of the delivery. There is no dispute in the evidence that the deceased was not then in sound health. Prior to the delivery of the policy he had been ordered by his physician to quit work and rest. He was then ill with an incurable disease of which he is bound to have been informed. In other words, he knew at the time that he was not in sound health, and, as the contract provided that the company assume no obligation under the policy, unless he was in sound health, and

as the parties had a right to make that contract, it not being prohibited by law, it was a valid contract. If there was any dispute about the fact that the appellant was sick at the time the policy was delivered, the testimony of the expert would not be controlling; that is, if there was anything to contradict it, the jury on a trial of fact could disbelieve it, but the plaintiff shows that the policy was received when the defendant was not in sound health, and her testimony as well as the death certificate shows that he knew he was not in sound health having been ordered to cease work and rest.

Sound health in the present case is a condition precedent to the validity of the policy. 37 C. J. 404, section 78; Roe v. National Life Ins. Ass'n, 137 Iowa, 696, 115 N. W. 500, 17 L. R. A. (N. S.) 1144, 1145, 1148, 1151; Connecticut General Life Ins. Co. v. Mullen (C. C. A.), 197 F. 299, 43 L. R. A. (N. S.) 725. In Mutual Life Ins. Co. v. Vaughan, 125 Miss. 369, 88 So. 11, 13, the insurance policy had a provision similar to this, but the insurance company sent the policy to the agent with instruction not to deliver it without a health certificate showing good health at the time of the delivery, but the agent failed to comply with the letter of instruction and delivered the policy. The company there selected its own means of determining the facts and did not trust to the fact or nonfact existing at the time of the delivery, but prohibited delivery without the certificate. As the agent of the company delivering the policy under the circumstances was acting for the company and under its instructions, his act was deemed to be the act of the company, and there was a waiver of the condition by no insistence upon the rule it adopted. The battle there was merely over whether or not there was a valid delivery of the policy. Responding to this contention we said: "It is insisted that there was no delivery of the policy in such sense as to bind the company. It was also insisted

that there is no proof of the payment of the premium under the terms of the policy and the application for the policy, and the officers of the company whose depositions are taken, who have charge of this department of the company's business at its home office, testify that no premium was ever paid, as also does the local agent, while the plaintiff testifies that she has no knowledge of the payment of the premium. It will be first necessary to determine whether the policy was delivered, and, if it was delivered, it will then be necessary to determine the effect of the receipt contained on the face of the policy upon this question. In Stewart v. Coleman & Co., 120 Miss. 28, 81 So. 653, we construed section 2615, Code of 1906 (section 5078, Hemingway's Code 1917), and held that the agent delivering a policy of insurance under that section of the code was the agent of the company for that purpose, and gave effect to a delivery of a policy in the same manner and to the same extent as if it had been delivered by the principal. . . . In sending a policy to an agent in this state for delivery, with instructions as to what to require, the instructions will not be binding upon the beneficiary in the policy, unless the beneficiary or the insured had knowledge of the conditions contained in the instructions to the agent. If the agent violated his instructions, without knowledge or acquiescence on the part of the beneficiary, or on the part of the insured, then the company must bear the consequences of the agent's violation of his instructions so far as the beneficiary and the insured are concerned.''

In the present case no such instructions or conditions are involved. The policy was written upon the express condition that it was not to be effective unless the insured was in sound health at the time of the delivery. There is nothing in this record to constitute a waiver of this stipulation. The policy was left at the home of the insured with his wife, the beneficiary, while he was ab-

sent, and there is nothing shown from which a waiver of the provision can be implied.

As the court below permitted a recovery upon the policy, and as we think the provision defeats liability, the judgment must be reversed and judgment rendered here for the appellant.

Reversed and rendered.